UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- v. -

158.79928457 BITCOIN; and
158.79867767 BITCOIN CASH;

Defendants-*in-rem*.

**VERIFIED COMPLAINT
FOR FORFEITURE**

26  Civ. 4093

Plaintiff United States of America, by its attorney, Jay Clayton, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I.    **JURISDICTION AND VENUE**

1.    The United States of America brings this civil action *in rem* under Title 18, United States Code, Sections 981 and 982 and Title 21, United States Code, Sections 881 and 853, seeking the forfeiture of the following digital assets, all currently in the custody of the United States Department of Homeland Security, Homeland Security Investigations ("HSI"):

    a.   158.79928457 bitcoin ("BTC"); and

    b.   158.79867767 bitcoin cash ("BCH")

(the "Defendants-*in-rem*").

2.    As described below, the Defendants-*in-rem* are traceable to illegal drug sales on the online marketplace Silk Road, and property involved in the laundering of those criminal proceeds. The Defendants-*in-rem*, all cryptocurrency, were earned by Silk Road narcotics vendors, who then transferred the cryptocurrency to a Germany-based cryptocurrency broker ("Broker-1")

1

in exchange for cash. Those Silk Road narcotics vendors earned bitcoin selling and shipping drugs to customers in the Southern District of New York.

3.     This Court has jurisdiction under Title 28, United States Code, Sections 1345 and 1355.

4.     Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

## II.    **<u>BACKGROUND</u>**

A. <u>Silk Road</u>

5.     Silk Road was an online black market, in operation from approximately 2011 to 2013. Silk Road was used by drug dealers and other unlawful vendors to distribute illegal drugs and other illicit goods and services. Silk Road was also a means for laundering the proceeds of narcotics distribution and the sale of other illicit goods and services.

6.     Silk Road was designed to facilitate anonymous illegal transactions beyond the reach of law enforcement.  One mechanism the site used to accomplish this involved operating on the "dark web," a term commonly referring to the collection of websites that are accessible only through anonymizing networks overlaid on top of the internet. Such networks include The Onion Router ("Tor"), the Invisible Internet Project ("I2P"), and others. These networks generally obscure both the content of traffic passing through them and the routing information for that traffic, making it difficult to trace any given user's IP address or identify the physical location of any website.

7.     Silk Road specifically operated on the Tor network, the most widely used of these anonymizing systems. Websites operating on the Tor network are commonly referred to as

"hidden services" and are accessed using URLs that end in ".onion." Accessing a hidden service typically requires a web browser called the "Tor Browser" or similar Tor-enabled software.

8.    Silk Road's most common offerings were illegal drugs, which were openly advertised on the site as such, and were immediately and prominently visible on the site's home page. At any given time, multi-kilogram quantities of heroin, cocaine, and methamphetamine, as well as distribution quantities of other controlled substances such as LSD, were offered on the site.

9.    In addition to narcotics, other illicit goods and services were openly sold on Silk Road, including illegal computer hacking services, malicious software (such as password-stealing programs), forged identity documents, stolen financial and identity information, and murder-for-hire or "hitman" services.

10.    Silk Road retained certain information regarding its users. For example, as to vendor profiles, Silk Road retained data as to which items they offered for sale, and the total sales of those items (completed, cancelled, or otherwise).

11.    Silk Road's "forum," a site-wide message board, contained extensive guidance on how to evade law enforcement. It included, for instance, numerous posts by users offering advice to other users on how they should configure their computers to avoid leaving any forensic trace of their use of Silk Road.

12.    The only form of payment accepted on Silk Road was bitcoin.

13.    Silk Road operated as an "escrow marketplace," where user funds were treated similarly to funds in a bank account. When users wished to add funds, the market provided a bitcoin "deposit address," similar to a bank account number. The market, which controlled this deposit address, received any funds sent to it and provided a corresponding credit to the user's escrow account.

3

14.     Once funds had been credited to a user's account, that user could purchase products from vendors operating on the Silk Road market. Upon completion of such a purchase, the market debited the order value from the user's account and credited the value to the vendor's account. Similar to intra-bank transactions, the ordering process required adjusting the balances recorded for the user's account and vendor's account; no bitcoin was actually transferred across the bitcoin network.

15.     Conversely, users wishing to withdraw funds provided a bitcoin "withdrawal address" to the market. The market would send the requested funds from its "cryptocurrency wallet" to that address and debit a corresponding amount from the user's Silk Road escrow account. These funds would leave the Silk Road escrow account and transit the bitcoin network.

16.     Silk Road charged a commission for every purchase conducted by its users. The commission rate varied from approximately eight to 15 percent per transaction.

17.     While the site was operational, Silk Road vendors agreed to ship, and did ship, controlled substances to customers in the Southern District of New York.

B.  Mt. Gox

18.     Mt. Gox was a bitcoin exchange platform based in Tokyo, Japan that was launched in or about 2010.

19.     Mt. Gox enabled its customers, for a fee, to exchange fiat currency, including United States dollars, for bitcoin. Customers could deposit, store, and withdraw their bitcoin and fiat currency over the internet through the Mt. Gox website.

20.     In or about February 2014, Mt. Gox shut down and entered liquidation proceedings in Japan. The sudden shutdown caused Mt. Gox's estimated 750,000 customers to lose access to their accounts, preventing them from withdrawing their bitcoin from the exchange.

21.     In or about 2018, the Japanese court overseeing the Mt. Gox liquidation appointed a Japanese attorney as Mt. Gox's Rehabilitation Trustee.[1] In or about 2021, a plan was approved wherein billions of dollars of bitcoin would be paid to satisfy approved claims. Creditors with approved claims were contacted by the Rehabilitation Trustee to verify their account information, and were ultimately informed that they may be eligible to receive a percentage of the funds they had previously held on the Mt. Gox platform at the time of liquidation in satisfaction of their bankruptcy claims.

22.     The Mt. Gox Rehabilitation Trustee selected U.S.-based cryptocurrency exchange Kraken, among other exchanges, to receive distributions by the Trustee to Mt. Gox's creditors.

23.     In or about July 2024, the Mt. Gox Rehabilitation Trustee transferred bitcoin and a cryptocurrency called bitcoin cash[2] to Kraken in satisfaction of multiple Mt. Gox creditors' claims.

III.     **THE DEFENDANTS-*IN-REM***

A. Broker-1 Ran a Cryptocurrency Cashout Business

24.     Data from Silk Road, Mt. Gox, and another defunct cryptocurrency exchange known as Local Bitcoins ("LBC"), as well as email communications, demonstrate that, from at

---

[1] A "Rehabilitation Trustee" is similar to a Chapter 11 or Chapter 7 Trustee in a federal bankruptcy proceeding, insofar as they help administer the estate and make payments to creditors.
[2] On August 1, 2017, bitcoin cash launched as a separate network, using a modified version of bitcoin's open-source code. The new network adopted the bitcoin blockchain's existing transaction history as its own starting point, then operated as an independent network from August 1, 2017 forward. Because the new network began from a copy of bitcoin's then-current ledger, every address held a balance of bitcoin cash numerically equal to the balance of bitcoin it held at that address at the time of the split. That is, each bitcoin holder was given one bitcoin cash for each bitcoin held.

least in or about September 2012 to in or about February 2014, Broker-1 ran a business exchanging cash for cryptocurrency in Germany ("Broker-Business-1").

25.    Broker-1 arranged transactions with customers through electronic communications, including by using a particular Gmail account ("Broker-1's Gmail Account"). Broker-1 would agree with a user to sell or buy a particular quantity of bitcoin at a particular price. Broker-1 is not known to have advertised a publicly accessible commercial space to customers for exchanges, or to have otherwise revealed a fixed address to customers. At times, the transactions would occur digitally, with a customer showing proof of a deposit to a bank account controlled by Broker-1, followed by Broker-1 transferring bitcoin. Other times, Broker-1, or someone working with Broker-1, would arrange to meet the customer in a public place to exchange cash with the customer.

26.    While operating this cash for cryptocurrency exchange business, Broker-1 was aware that criminals used bitcoin for illegal activity, including illegal drug transactions.  Broker-1 was also familiar with Silk Road, was aware that Silk Road was a marketplace predominantly used for criminal activity, and was aware that Broker-1's customers included Silk Road users.

27.    On or about January 17, 2013, in an email exchange with a customer, Broker-1 agreed to transfer bitcoin to the customer at a certain rate if the customer sent a screenshot of a bank transfer of cash to Broker-1. The customer sent the screenshot, which included a webpage confirming a deposit into Broker-1's account at Raiffeisen Bank. The same screenshot shows that the customer also had the Tor web browser open to Silk Road, with the browser displaying vendor listings and prices for amphetamines, hash, and cocaine, shipping from Germany to anywhere in the world.

28.    On or about March 5, 2013, a customer contacted Broker-1 through LBC,

6

requesting to purchase 2.1576 BTC in exchange for 70 Euros. The customer, explaining where to send the BTC, wrote, "this is the address:  http://silkroadvb5piz3r.onion/index.php." A few minutes later, the customer clarified, "sorry [that's] not the address", then shortly afterward sent Broker-1 a bitcoin wallet address ending in bjTm. Despite the customer initially referencing the primary Tor address for Silk Road, Broker-1 replied, in substance and in part, that Broker-1 planned to send the currency, and shortly after informed the customer that the trade was complete.

29.     In addition, Broker-1, using Broker-1's Gmail Account, discussed Silk Road in connection with Broker-1's business. For instance:

a.     On or about January 26, 2013, while advising a customer on how to increase the customer's anonymity when conducting cryptocurrency transactions by using the Tor web browser, Broker-1 noted that "sellers of silkroad [sic] are generally fine with using mixers."  Upon information and belief, Broker-1's statement in this email reflects an understanding that sellers on Silk Road were engaged in the sale of illegal narcotics and frequently used cryptocurrency mixers[3] to conceal their connection to, and the source of, their proceeds.

---

[3] By default, all transactions on the bitcoin blockchain—a decentralized online ledger of all bitcoin transactions—are public, that is, anyone with the means of accessing the blockchain can trace all transaction activity on it. To reduce this transparency, transactions can be disguised by using a so-called "tumbler" or "mixer" to obscure the link between the source of a bitcoin payment and its ultimate recipient. In a typical tumbling transaction, a user sends funds to a bitcoin address controlled by the tumbling service and provides instructions on where and how to withdraw those funds. The tumbler then combines that user's deposit with bitcoin from many other users in a common pool before sending different bitcoins from that pool to the user's designated withdrawal address or addresses. By completing the withdrawal with different funds than those the user deposited, the tumbler breaks the direct, one-to-one link on the public bitcoin ledger between the user's deposit address in the tumbler and the withdrawal address to which they direct the funds. Tumblers often further obscure this connection by conducting the withdrawal in multiple smaller transactions, of varying amounts, interspersed with random time delays. All of these actions significantly hinder efforts by law enforcement and others to trace the

b.    On or about October 2, 2013, it was publicly reported that law enforcement had seized and shut down Silk Road.  That same day, Broker-1 emailed a business partner in Broker-1's business.  The body of the email was blank, but the subject line stated, in translation, "Ouch. Silkroad [sic] is no more…" Upon information and belief, Broker-1's statement reflects an understanding that Broker-1's cryptocurrency-for-cash exchange business would be significantly and negatively impacted by the shutdown of Silk Road.

B.    Broker-1 Received Drug Sale Proceeds from Silk Road Vendor "Bungee54"

30.    MDMA, amphetamine, LSD and cocaine are controlled substances under the federal Controlled Substances Act. It is also illegal to sell these substances in Belgium, Czechia, Germany, and other European nations.

31.    Among Silk Road's vendors was a user with the handle "Bungee54." On numerous occasions, Bungee54 sold controlled substances on the Silk Road platform, including MDMA, amphetamine and cocaine, to, among others, customers in the Southern District of New York, in exchange for bitcoin. Records maintained by Silk Road show the following, in substance and in part:

a.    Bungee54's Silk Road page listed narcotics for sale. For instance:

i.    On or about July 19, 2013, Bungee54 offered an item for sale on Silk Road: "2x 1 Ounce MDMA crystals," listed as shipping from Belgium, worldwide.

ii.    On or about July 21, 2013, Bungee54 offered several items for sale, including "50g MDMA" and "100g of Speed / Amphetamine paste."

---

flow of those funds, and indeed a common purpose of such tumblers is to conceal and promote criminal activity.

b.    Silk Road records also indicate that Bungee54 shipped drugs to the Southern District of New York. On or about July 19, 2013, for example, a transaction was finalized between Bungee54 and user pasta1515, for approximately 9.5 BTC, with shipping to an address in Cornwall, New York, and a message, reading in part, "special request to leave product in as big crystals as possible." In addition, on or about July 22, 2013, a transaction was finalized between Bungee54 and user SouthernRedScorpion for approximately 153.46 BTC, with an item shipped to an address in Ardsley, New York.

32.    On or about August 2, 2011, Broker-1 opened an account at Mt. Gox ("Broker-1's First Mt. Gox Account"). As a part of Mt. Gox's account opening process, Broker-1 provided Mt. Gox with Broker-1's legal name, date of birth, and other identifying information.

33.    On or about August 4, 2013, approximately 84 BTC was transferred from Bungee54's account at Silk Road ("Bungee54's Silk Road Account") to a bitcoin address beginning in 1Fyp and ending in JEXd (the "JEXd Address").[4] On or about August 5, 2013, approximately 3.5 BTC was transferred from Bungee54's Silk Road Account to a bitcoin address beginning in 188x and ending in VnGn (the "VnGn Address"). Also on or about August 5, 2013, a combined total of approximately 93 BTC—including 84 BTC from the JEXd Address, 3.5 BTC from the VnGn Address, and approximately 5.6 BTC from a different address—were transferred simultaneously to Broker-1's First Mt. Gox Account. This transaction further sent a small remainder of approximately 0.1 BTC to an address beginning in 1EWM and ending in GjcE (the "GjcE Address").

---

[4] The attribution of the transactions described herein to withdrawals from Silk Road by Bungee54 is based on a comparison of blockchain data with data from a database of Silk Road transactions, matching against the bitcoin address to which funds were sent, the transaction date, the transaction amount, and approximate time of the transaction.

34.     On or about August 6, 2013, approximately 37.7 BTC was transferred from Bungee54's Silk Road Account and deposited into a bitcoin address beginning in 13ya and ending in Xbu5 (the "Xbu5 Address"). Less than one hour later, 37.8 BTC originating from Bungee54's Silk Road Account (composed of approximately 37.7 BTC from the Xbu5 Address and approximately 0.1 BTC from the GjcE Address) was transferred into Broker-1's First Mt. Gox Account.

35.     On or about August 6, 2013, approximately 10.6 BTC was transferred from Bungee54's Silk Road Account to a bitcoin address beginning in 137c and ending in nBWP (the "nBWP Address"). Later that same day, approximately 3.59 BTC was transferred from the nBWP Address to Broker-1's First Mt. Gox Account.

36.     In total, between on or about August 4, 2013 and on or about August 6, 2013, approximately 128.78 BTC was transferred from the Bungee54 Silk Road Account, most often through a single intermediary address, to Broker-1's First Mt. Gox Account, where it was intermingled with other bitcoin.[5] At no time after on or about August 6, 2013, and prior to the transfer of the account balance to a Kraken account as described below, did the balance in Broker-1's First Mt. Gox Account fall below at least 128.78 BTC or equivalent value.[6]

---

[5] Arguably, the approximately 5.6 BTC noted above in the August 5, 2013 transaction derived, in whole or in part, from Bungee54's Silk Road Account. These funds were intermingled with other funds in intermediary bitcoin addresses, and the preceding transactions are not fully described here. Because none of the approximately 5.6 BTC is included in the total calculation of approximately 128.78 BTC moving from Bungee54 to Broker-1's First Mt. Gox Account (i.e., 84 BTC from the JEXd Address, plus 3.5 BTC from the VnGn Address, minus 0.1 sent to the GjcE Address, plus 37.8 BTC jointly from the Xbu5 Address and the GjcE Address, plus 3.59 BTC from the nBWP Address, minus bitcoin network fees), this calculation is likely a conservative one.

[6] Mt. Gox accounts could include separate wallets for different currencies. Broker-1's First Mt. Gox Account included bitcoin (BTC), United States dollar (USD), euro (EUR), British pound

37.      In addition to Broker-1's First Mt. Gox Account, on or about September 20, 2012, Broker-1 opened a second Mt. Gox account ("Broker-1's Second Mt. Gox Account"). In or about 2013, Broker-1's Second Mt. Gox Account also accepted bitcoin associated with the Bungee54 Silk Road Account before being closed by Mt. Gox. Sometime after receiving bitcoin from Bungee54 and at least one other Silk Road vendor, as discussed below, Broker-1's Second Mt. Gox Account sent over 5,000 BTC to Broker-1's First Mt. Gox Account.

C.   Broker-1 Received Drug Sale Proceeds from Silk Road Vendor "Haizenberg"

38.      Broker-1's Second Mt. Gox Account also received bitcoin from Silk Road vendor "Haizenberg," who sold, among other things, MDMA and LSD. Haizenberg's Silk Road page plainly listed illegal narcotics for sale.  For example, on or about January 13, 2013, Haizenberg offered "1g MDMA 87% Purity QUALITY GUARANTEED ! AMAZING!"

39.      Based on Haizenberg's Silk Road data, Haizenberg had numerous clients based in the United States, including in the Southern District of New York. For instance, on or about July 6, 2013, Haizenberg transacted with user SouthernRedScorpion, shipping to an address in Ardsley, New York, in exchange for approximately 1.15 BTC. On or about the same day, Haizenberg transacted with user qdmc0693, shipping to an address in White Plains, New York, in exchange for approximately 0.6 BTC.

40.      Between on or about July 14, 2013 and on or about July 29, 2013, approximately 181.9 BTC was transferred out of Haizenberg's Silk Road Account to various intermediary addresses before being funneled into Broker-1's Second Mt. Gox account. The final

---

(GBP), and Swiss franc (CHF) wallets. Between August 6, 2013 and the transfer of the account balance to Kraken, the value of Broker-1's First Mt. Gox Account, across all wallets, was at least the equivalent of 128.78 BTC, when valuing non-bitcoin currencies in bitcoin at then-prevailing exchange rates.

transfer of the funds into Broker-1's Second Mt. Gox account occurred through seven transactions, each on July 29, 2013, occurring nearly simultaneously.[7] That the seven transactions on July 29, 2013 occurred so close in time to each other, and involved funds traceable to Haizenberg's Silk Road Account, strongly suggests that the transactions represented a coordinated transfer from Haizenberg's Silk Road Account to Broker-1's Second Mt. Gox account.

41.     Because Silk Road operated as an escrow service, pooling its bitcoin, the withdrawals from Haizenberg's Silk Road Account referenced above (totaling approximately 181.9 BTC) were made from multiple Silk Road bitcoin addresses.  In total, over the course of 18 transactions, the bitcoin in question were transferred directly from Haizenberg's Silk Road Account (using 18 different Silk Road bitcoin addresses) to multiple intermediary bitcoin addresses. In some instances (cumulatively accounting for approximately 87.5 BTC), funds were then transferred directly to Broker-1's Second Mt. Gox Account, without other funds intermixed. In other instances, the funds were transferred through a second or third intermediary address before arriving at Broker-1's Second Mt. Gox Account. In some of these instances, the bitcoin was intermingled in a wallet with bitcoin from other sources, before arriving at Broker-1's Second Mt. Gox Account. However, blockchain analysis demonstrates that at least approximately 180.08 BTC that was transferred to Broker-1's Second Mt. Gox Account on or about July 29, 2013 (inclusive of the approximately 87.5 BTC referenced above) must have been sourced from Haizenberg's Silk Road Account.

42.     At no time between July 29, 2013 and September 2, 2013, when more than 5,000 BTC were transferred from Broker-1's Second Mt. Gox Account to Broker-1's First Mt.

---

[7] According to Mt. Gox records, one of the transactions was credited to the balance in Broker-1's Second Mt. Gox Account at 9:58:00 PM, and the other six were credited at 9:59:02 PM.

Gox Account, did the balance in Broker-1's Second Mt. Gox Account fall below 180 BTC or equivalent value.[8] Moreover, at no time after September 2, 2013 (and before the Mt. Gox liquidation) did the balance in Broker-1's First Mt. Gox Account fall below 158.79928457 BTC or equivalent value.[9]

### D. Tainted Funds in Broker-1's First Mt. Gox Account Were Transferred to Kraken, then Seized by Court Order

43.     On or about November 16, 2013, Broker-1 opened account number AA90 N84G UFOP 3GXA at cryptocurrency exchange Kraken ("Broker-1's Kraken Account"), providing Kraken with Broker-1's legal name and date of birth. That personal identifying information matches the information provided to Mt. Gox for opening Broker-1's First Mt. Gox Account. In connection with the Mt. Gox liquidation, Broker-1 designated Broker-1's Kraken Account to receive funds from the Mt. Gox Rehabilitation Trustee.

44.     On or about July 22, 2024, the Honorable Valerie Figueredo, United States Magistrate Judge for the Southern District of New York, issued an anticipatory seizure warrant, authorizing the Government to seize funds to be deposited by the Mt. Gox Rehabilitation Trustee into Broker-1's Kraken Account, and freezing Broker-1's Kraken Account. On or about the same date, Kraken froze Broker-1's Kraken Account, preventing any withdrawals by Broker-1.

---

[8] Mt. Gox accounts were able to include separate wallets for different currencies. Broker-1's Second Mt. Gox Account included Bitcoin (BTC), United States dollar (USD), and euro (EUR) wallets. Between July 29, 2013 and the transfer of the account balance to Broker-1's First Mt. Gox Account, the value of Broker-1's Second Mt. Gox Account, across all wallets, was at least the equivalent of 4853.34 BTC, when valuing non-bitcoin currencies in bitcoin at then-prevailing exchange rates.

[9] Between September 2, 2013 and the Mt. Gox liquidation, the value of Broker-1's Second Mt. Gox Account, across all wallets, was at least the equivalent of 608.023 BTC, when valuing non-bitcoin currencies in bitcoin at then-prevailing exchange rates.

13

45.    On or about July 23, 2024, in connection with the resolution of bankruptcy claims, Broker-1's Kraken Account received approximately 158.79928457 BTC and 158.79927767 BCH[10] in satisfaction of Broker-1's claim with the Mt. Gox Rehabilitation Trustee.

46.    Through transactions on or about July 31, 2024 and August 8, 2024, and pursuant to the July 22, 2024 warrant, HSI received a total of 158.79941457 BTC and 158.79867767 BCH[11] from Kraken; the funds remain in HSI custody.

47.    The Defendants-*in-rem* are the following:

(a)    158.79928457 BTC, representing the amount of bitcoin received by HSI from Kraken, up to the amount of bitcoin received by Kraken from the Mt. Gox Rehabilitation Trustee in satisfaction of Broker-1's claim; and

(b)    158.79867767 BCH, representing the amount of bitcoin cash received by HSI from Kraken (which, due to transaction fees, is slightly less than the amount of bitcoin cash received by Kraken from the Mt. Gox Rehabilitation Trustee in satisfaction of Broker-1's claim).

48.    Based on the foregoing, there is reason to believe that the Defendants-*in-rem* constitute proceeds of narcotics trafficking and property involved in money laundering transactions.

---

[10] The bitcoin cash transferred to Broker-1 resulted from that cryptocurrency's launch in 2017. As explained above, holders of bitcoin at the time of the launch of bitcoin cash automatically received bitcoin cash, so any bitcoin cash derived from Silk Road users' narcotics sales that remained in Broker-1's holdings at Mt. Gox at the time Mt. Gox declared bankruptcy and froze its customers' accounts (and which Broker-1 had received years before the launch of bitcoin cash) also constitutes proceeds from the sale of narcotics and property involved in money laundering.

[11] The amounts received by HSI represent the initial amounts received by Kraken from the Mt. Gox Rehabilitation Trustee, minus transaction fees totaling .00023 BTC and .0006 BCH, plus an excess of .00013 BTC stemming from a test transaction.

## IV.   **FIRST CLAIM FOR FORFEITURE**

49.     The allegations above are incorporated by reference.

50.     Title 21, United States Code, Section 881(a)(6) subjects to forfeiture all "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Subchapter I of Title 21], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of [Subchapter I of Title 21]."

51.     Based on the foregoing, the Defendants-*in-rem* are subject to forfeiture under Title 21, United States Code, Section 881(a)(6) on the grounds that the Defendants-*in-rem* constitute moneys furnished and intended to be furnished by any person in exchange for a controlled substance and proceeds traceable to such an exchange, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## V.   **SECOND CLAIM FOR FORFEITURE**

52.     The allegations above are incorporated by reference.

53.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

54.     Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .
>
> knowing that the transaction is designed in whole or in part . . . to

15

conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

55.    Under Title 18, United States Code, 1956(c)(7)(A), "specified unlawful activity," includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title." Title 18, United States Code, Section 1961(1) in turn lists as an offense "racketeering activity," which includes, among other things, "any act ... dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."

56.    Under Title 18, United States Code, Section 1956(c)(7)(B)(i), "specified unlawful activity," also includes, among other things, "an offense against a foreign nation," where the financial transaction at issue "occurr[ed] in whole or in part in the United States" and the offense "involve[ed]…the…sale…or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act)." Based on the foregoing, the Defendants-*in-rem* are subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A), on the grounds that the Defendants-*in-rem* constitute property involved in money laundering transactions of narcotics proceeds in violation of Title 18, United States Code, Section 1956, and property traceable to such property.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants-*in-rem* and that all persons having an interest in the Defendants-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants-*in-rem* to the United States of America for

16

disposition according to law, and that this Court grant plaintiff such further relief as this Court

may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       May 15, 2026

                                        JAY CLAYTON
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the Plaintiff
                                        United States of America


                             By:    __/s/_____
                                        T. Josiah Pertz
                                        Assistant United States Attorney
                                        26 Federal Plaza
                                        New York, New York 10278

## VERIFICATION

STATE OF NEW YORK                          )
COUNTY OF NEW YORK                       :
SOUTHERN DISTRICT OF NEW YORK   )

     KYLER HARDIN, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"); that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

     I declare under penalty of perjury that I am within the United States, and the foregoing is true and correct.

Executed on MAY 15, 2026

Kyler Hardin
Special Agent
Homeland Security Investigations

18